C.K. & J.K., INC., APPELLANT, *v.*
FAIRVIEW SHOPPING CENTER CORP. ET AL., APPELLEES.

[Cite as C.K. & J.K., Inc., v. Fairview Shopping Center (1980), 63 Ohio St. 2d 201.]

(No. 79-944—Decided July 23, 1980.)

*Messrs. Drain & Drain* and *Mr. John M. Drain,* for appellant.

*Messrs. Cavitch, Familo & Durkin* and *Mr. Thomas C. Schrader,* for appellee Fairview Lounge, Inc.

*Messrs. Portner, Greenfield, Lovinger & Schwartz* and *Mr. Mark B. Schwartz,* for appellee Fairview Shopping Center Corporation.

CELEBREZZE, C. J.   The basis of appellant's claim that

the lease between the lounge and the shopping center constitutes an unfair arrangement is R. C. Chapter 1331.

R. C. 1331.01 states in relevant part:

"(B) 'Trust' is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

"(1) To create or carry out restrictions in trade or commerce;

"(2) To limit or reduce the production, or increase or reduce the price of merchandise or a commodity;

"(3) To prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, produce, or a commodity;

"(4) To fix at a standard or figure, whereby its price to the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce, or commerce intended for sale, barter, use, or consumption in this state;

"(5) To make, enter into, execute, or carry out contracts, obligations, or agreements of any kind by which they bind or have bound themselves not to sell, dispose of, or transport an article or commodity, or an article of trade, use, merchandise, commerce, or consumption below a common standard figure or fixed value***

"***

"A trust as defined in division (B) of this section is unlawful and void."

R. C. 1331.06 states:

"A contract or agreement in violation of sections 1331.01 to 1331.14, inclusive, of the Revised Code, is void."

Under R. C. 1331.08, a party may bring an action for double the amount of damages sustained by him as a result of unlawful conduct under R. C. 1331.01 to 1331.14.

These statutes, known as the Valentine Act, were patterned after the Sherman Antitrust Act, and as a consequence this court has interpreted the statutory language in light of federal judicial construction of the Sherman Act—most significantly, *Standard Oil Co.* v. *United States* (1911), 221 U.S. 1. *List* v. *Burley Tobacco Growers' Co-op Assn.* (1926), 114 Ohio St. 361.

In *Standard Oil,* the United States Supreme Court stated, at page 62, that in construing the Sherman Act, "the criteria

to be resorted to in any given case for the purpose of ascertaining whether violations***have been committed, is the rule of reason guided by the established law and by the plain duty to enforce the prohibitions of the act and thus the public policy which its restrictions were obviously enacted to subserve. And it is worthy of observation***that although the statute***makes it certain that its purpose was to prevent undue restraints of every kind or nature, nevertheless by the omission of any direct prohibition against monopoly in the concrete, it indicates a consciousness that the freedom of the individual right to contract, when not unduly or improperly exercised was the most efficient means for the prevention of monopoly***."

This court adopted this rule of reason in paragraph four of the syllabus in *List, supra,* which states:

"Contracts in restraint of trade are not illegal except when unreasonable in character. When such contracts are incident and ancillary to some lawful business and are not unreasonable in their scope and operation they are not illegal."

Although this court has not been faced before with the issue of whether restrictions in a shopping center lease are reasonable restraints on trade, a number of courts have addressed the issue under similar statutes and found such clauses to be valid. Under federal law, for example, in *Savon Gas Stations* v. *Shell Oil Co.* (C.A. 4, 1962), 309 F. 2d 306, the court allowed a clause in a shopping center lease with an on-premises gas station under which the owner could not allow another gas station to use the tract of land upon which the shopping center was located. The court determined, at page 309, that the restriction could not be characterized as imposing an "unreasonable or undue restraint upon***commerce" because the legitimate needs of a shopping center often required that such restrictions be available.

A number of other courts have recognized that restrictions in shopping center leases do not violate statutes prohibiting restraints of trade as long as they are reasonable in scope. *Goldberg* v. *Tri-States Theatre Corp.* (C.A. 8, 1942), 126 F. 2d 26; *Marvin County Bd. of Realtors* v. *Palsson* (1976), 16 Cal. 3d 920, 130 Cal. Rptr. 1; *Pensacola Associates* v. *Biggs Sporting Goods* (Fla. App. 1978), 353 So. 2d 944; *Mendell* v.

*Golden-Farley of Hopkinsville, Inc.* (Ky. App. 1978), 573 S.W. 2d 346; *Grempler* v. *Multiple Listing Bureau of Hartford County, Inc.* (1970), 258 Md. 419, 266 A. 2d 1; *Utica Square, Inc.,* v. *Renberg's Inc.* (Okla. 1964), 390 P. 2d 876; *Karam* v. *H. E. Butt Grocery Co.* (Tex. Civ. App. 1975), 527 S.W. 2d 481.

We join these courts in finding that, ordinarily, a provision in a shopping center lease granting a lessee the exclusive right to carry on a certain line of business in the shopping center does not constitute an illegal restraint of trade under R. C. Chapter 1331, as long as the scope and effect of the restriction is not unreasonably broad. We do so out of a recognition of the fact that lease restrictions are often necessary in order for a shopping center to obtain a desirable tenant.

The restriction in the case at bar is not unreasonably broad in scope or effect. The restriction does not affect the entire community, only the shopping center (a restaurant with a full liquor permit operates across the street). In addition appellant is permitted to sell beer. As a consequence, appellees have not violated R. C. Chapter 1331.*

Neither are the restrictions against public policy. As the court stated in *Rhoades* v. *Equitable Life Assur. Soc.* (1978), 54 Ohio St. 2d 45, 47, quoting from *L'Orange* v. *Medical Protective Co.* (C.A. 6, 1968), 394 F. 2d 57, 60, in discussing an insurance contract provision, the test of whether a provision "is void as against public policy is whether its purpose is ' "injurious to the public or contravenes some established interest of society." ' "

We have already held that the restrictions in leases before us are reasonable in scope and effect and are necessary in order to obtain desirable tenants. These restrictions are not void as contrary to public policy.

Appellant also argues that the restrictions in the leases are invalid because they intrude on the area of liquor regulation which the state exclusively controls under statute. Appellant argues that once a permit is issued to a location (which re-

---

* Although appellant contends that price fixing is involved, a review of the record indicates that no evidence was presented sufficient to prove such a claim.

quires that the zoning ordinance allow it), the use of that permit cannot be restricted by private agreement.

R. C. Chapter 4303 controls the sale of alcoholic beverages; a licensing scheme is used. Various classes of permits are provided which allow holders to offer different services. Under R. C. 4303.25 no person can sell alcoholic beverages unless he holds a permit or is otherwise permitted to sell under the statute.

One applies for a permit or to relocate or transfer a permit under R. C. 4303.26. The Department of Liquor Control must notify the appropriate local governmental entity and hold a hearing on the advisability of the issuance, transfer, or relocation of the permit. Under R. C. 4303.29, a limitation is placed on the number of D-3, D-4, or D-5 permits which can be issued for a given municipality based on the municipality's population.

Nothing in the statutory scheme indicates that the General Assembly intended to exclude private lease restrictions. While it is true that by simply holding a permit without using it appellant can deprive a community of a usable permit because of the limitation on the issuance of permits in R. C. 4303.29, this does not indicate an intent to exclude private restrictions.

Economic considerations are imposed in the statute which should deter a permit holder from continuing to hold his permit without actually using it. For example, a D-5 permit costs its holder $1,250 per year. A D-1 permit costs only $125 per year. The legislature, through use of this system, provided strong and sufficient incentives against holding permits that are not used.

We hold that the General Assembly did not intend to preclude private lease restrictions regarding the sale of alcoholic beverages when it enacted R. C. Chapter 4303 which regulates the sale of alcoholic beverages by requiring permits in order to make such sales.

Accordingly, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

HERBERT, W. BROWN, P. BROWN, SWEENEY, LOCHER and HOLMES, JJ., concur.