JOHNSON, APPELLANT, *v.* MICROSOFT CORPORATION, APPELLEE.

[Cite as *Johnson v. Microsoft Corp.,*
106 Ohio St.3d 278, 2005-Ohio-4985.]

(No. 2004–0304—Submitted February 15, 2005—Decided October 5, 2005.)

O'DONNELL, J.

{¶ 1} The principal issue for our consideration on this appeal concerns whether plaintiff-appellant, Maria Johnson, who purchased a computer from Gateway, Inc., containing a Microsoft Windows 98 operating system, may file a class action lawsuit against Microsoft Corporation for monopolistic pricing of its software in violation of the Ohio Valentine Act. After careful consideration, we have concluded that Johnson, as an indirect purchaser of Microsoft's operating system, may not assert a Valentine Act claim for alleged violations of state antitrust law.

*Factual Background and Procedural History*

{¶ 2} The record before us reveals that in April 1999, Maria Johnson purchased a computer from Gateway, Inc., a retailer, with a preinstalled Microsoft Windows 98 operating system. Microsoft develops and licenses operating systems, which allow the components of a personal computer to function with each other and to execute other software applications. It then distributes these operating systems to retailers such as IBM, Gateway, and Dell, where the software is installed and then sold with the computers to consumers.

{¶ 3} On May 25, 2000, Johnson filed an amended class action lawsuit in Hamilton County Common Pleas Court, alleging that Microsoft violated the Ohio Valentine Act, Ohio common law, and the Ohio Consumer Sales Practices Act ("CSPA") by engaging in monopolistic pricing practices with respect to its operating systems. Microsoft moved to dismiss the complaint, asserting that Johnson, as an indirect purchaser of Microsoft's operating system, could not state a claim, and the trial court granted that motion.

{¶ 4} The court of appeals affirmed the trial court's dismissal, concluding that Ohio follows federal antitrust law, and because *Illinois Brick Co. v. Illinois* (1977), 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, prohibits indirect purchasers from bringing federal antitrust actions, Johnson could not assert a Valentine Act claim against Microsoft. In addition, the court held that Johnson lacked standing to bring any common-law restitution or unjust-enrichment claims because she never conferred any direct benefit upon Microsoft. And it ruled that Johnson could not maintain a CSPA claim based on monopolistic pricing practices because the Valentine Act, not the Consumer Sales Practices Act, provides the exclusive remedy for such conduct.

{¶ 5} The cause is now before this court upon the acceptance of a discretionary appeal.

### Standard of Review

{¶ 6} When reviewing an order dismissing a complaint for failure to state a claim for relief, an appellate court must accept the material allegations of the complaint as true and make all reasonable inferences in favor of the plaintiff. *Maitland v. Ford Motor Co.*, 103 Ohio St.3d 463, 2004-Ohio-5717, 816 N.E.2d 1061, ¶ 11. For the moving defendant to prevail, it must appear from the face of the complaint that the plaintiff can prove no set of facts that would justify a court in granting relief. *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 280, 649 N.E.2d 182; *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.* (1992), 65 Ohio St.3d 545, 548, 605 N.E.2d 378. Therefore, we review the applicable law for each cause of action before us to determine whether the facts Johnson alleges in her complaint entitle her to relief. *Maitland*, 103 Ohio St.3d 463, 2004-Ohio-5717, 816 N.E.2d 1061, ¶ 12.

### The Valentine Act

{¶ 7} Johnson argues that the Valentine Act, R.C. 1331.01 et seq., permits an indirect purchaser to maintain an antitrust claim in Ohio and that even if the Act bars such a claim, she became a direct purchaser by entering into an end-user licensing agreement with Microsoft. Microsoft argues that since Ohio follows federal antitrust law, and since *Illinois Brick*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, prohibits indirect purchasers from asserting federal antitrust claims, Johnson—who never purchased any product directly from Microsoft—should not be able to maintain an Ohio Valentine Act claim. In addition, Microsoft urges that a consumer does not become a direct purchaser under the *Illinois Brick* rule by executing a software licensing agreement because the immediate economic transaction constituting the purchase occurs between the consumer and the retailer—in this case, between Johnson and Gateway, and not between Johnson and Microsoft.

*A. Indirect Purchaser*

{¶ 8} Regarding the issue of whether the Valentine Act allows indirect purchasers to maintain antitrust claims in Ohio, we recognize that the Ohio General Assembly patterned Ohio's antitrust provisions in accordance with federal antitrust provisions. Compare and contrast, for example, R.C. 1331.08, which governs the status of those who may bring a state-law antitrust action, with Section 4 of the Clayton Act, codified at Section 15, Title 15, U.S.Code.[1] Due to the similarity of these provisions, Ohio has long followed federal law in interpreting the Valentine Act. See *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.* (1980), 63 Ohio St.2d 201, 204, 17 O.O.3d 124, 407 N.E.2d 507, where we considered the application of R.C. 1331.01 to 1331.14 in connection with a liquor-permit dispute and held that "[t]hese statutes, known as the Valentine Act, were patterned after the Sherman Antitrust Act, and as a consequence this court has interpreted the statutory language in light of federal judicial construction" of the federal antitrust statutes. Accordingly, we will review the status of federal law with respect to who may properly assert an antitrust action.

{¶ 9} The United States Supreme Court has interpreted federal antitrust statutes as prohibiting an indirect purchaser of goods or services from bringing a private action against a seller engaged in allegedly monopolistic practices in the sale of those goods or services. See *Illinois Brick*, 431 U.S. at 746–747, 97 S.Ct. 2061, 52 L.Ed.2d 707. In that case, the state of Illinois and 700 local government entities sued several concrete-block manufacturers for price fixing—a practice prohibited by Section 1 of the Sherman Act, codified at Section 1, Title 15, U.S.Code, and for which a remedy is provided in Section 4 of the Clayton Act, Section 15, Title 15, U.S.Code. Although they did not directly purchase the concrete blocks from the manufacturers, the governmental entities alleged that the manufacturers passed on the cost of the overcharge to indirect purchasers such as themselves. The Supreme Court concluded that only the overcharged direct purchasers, not others in the chain of distribution, are considered injured parties under the Clayton Act, regardless of any amount those direct purchasers

---

1. {¶ a} R.C. 1331.08 provides:

{¶ b} "In addition to the civil and criminal penalties provided in sections 1331.01 to 1331.14 of the Revised Code, the person injured in the person's business or property by another person by reason of anything forbidden or declared to be unlawful in those sections, may sue therefor in any court having jurisdiction and venue thereof, without respect to the amount in controversy, and recover treble the damages sustained by the person and the person's costs of suit."

{¶ c} Section 4 of the Clayton Act, found at Section 15, Title 15, U.S.Code, provides:

{¶ d} "(a) * * * [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

may have passed on to their customers. Accordingly, the court held that only direct purchasers may assert federal antitrust claims. *Illinois Brick*, 431 U.S. at 729, 97 S.Ct. 2061, 52 L.Ed.2d 707.

{¶ 10} In reaching its decision, the court relied on its decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* (1968), 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231. There, Hanover Shoe, the retailer, asserted an antitrust claim against United Shoe Machinery Corporation, the manufacturer. United Shoe Machinery claimed that because Hanover Shoe passed on overcharges to its ultimate consumers, Hanover Shoe itself suffered no injuries from the allegedly monopolistic pricing practice. The court rejected United Shoe Machinery's defense, holding that the right to assert the claim belonged to Hanover Shoe, the retailer who paid the overcharge, regardless of whether Hanover Shoe passed the cost of the overcharge to its customers. The court's position in *Hanover Shoe* is consistent with its holding in *Illinois Brick* because in both cases the court determined that the right to assert a federal antitrust claim belonged to the injured party—the retailer who contracted directly with the manufacturer and paid the overcharge.

{¶ 11} Our research indicates that courts in at least 15 states have incorporated *Illinois Brick*'s direct-purchaser requirement into their antitrust decisions either by relying on statutes directing courts to follow federal case law or by adopting the rationale of the *Illinois Brick* decision.[2] By way of contrast, some 18 states

---

2. {¶ a} See, e.g., *Vacco v. Microsoft Corp.* (Conn.2002), 260 Conn. 59, 793 A.2d 1048 (Conn.Gen.Stat. 35–44b: "It is the intent of the General Assembly that in construing sections 35–24 to 35–46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes"); *Minuteman, LLC v. Microsoft Corp.* (N.H.2002), 147 N.H. 634, 637, 795 A.2d 833 ("By including [N.H.Rev.Stat.Ann.] 356:14 in the statute, the legislature expressly encouraged a uniform construction with federal antitrust law"); *Siena v. Microsoft Corp.* (R.I.2002), 796 A.2d 461 (Rhode Island's Antitrust Act, R.I.Gen.Laws 6–36–2(b): "This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable"); *O'Connell v. Microsoft Corp.* (Mass.Super.2001), 13 Mass.L.Rptr. 435, 2001 WL 893525 (Mass.Gen.Laws Ann. Ch. 93, Section 1: The Massachusetts Antitrust Act "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable"); *Abbott Laboratories, Inc. v. Segura* (Tex.1995), 907 S.W.2d 503 (Tex.Bus. & Com.Code 15.04: "The provisions of this Act shall be construed to accomplish this purpose [to promote competition] and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with" that purpose); *Davidson v. Microsoft Corp.* (2002), 143 Md.App. 43, 792 A.2d 336 (Md.Com. Law Code Ann. 11–202(a)(2): "courts [are to] be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters"); *Pomerantz v. Microsoft Corp.* (Colo.App.2002), 50 P.3d 929 (Colo.Rev.Stat. 6–4–119: "It is the intent of the general assembly that, in construing this article, the courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws"); *Major v. Microsoft Corp.* (Okla.Civ.App.2002), 60 P.3d 511 (79 Okla.Stat. Ann. 212: "The provisions of this act shall be interpreted in a manner consistent with Federal Antitrust Law * * * and the case law applicable thereto"); *Duvall v. Silvers, Asher, Sher &*

and the District of Columbia have enacted statutes explicitly rejecting *Illinois Brick* and permitting indirect purchasers to bring state-law antitrust actions.[3]

{¶ 12} The Ohio General Assembly has amended the Valentine Act several times since the announcement of the *Illinois Brick* decision, including several changes specifically designed to bring the Act into conformity with federal antitrust statutes;[4] however, it has never amended the law with respect to the *Illinois Brick* direct-purchaser requirement. We believe that this inaction on the part of the General Assembly reflects legislative satisfaction with the direction taken by this court in signaling our intent to follow federal law. See, e.g., *Spitzer v. Stillings* (1924), 109 Ohio St. 297, 142 N.E. 365, paragraph four of the syllabus, where the court held that "[w]here a statute is construed by a court of last resort having jurisdiction, and such statute is thereafter amended in certain particulars, but remains unchanged so far as the same has been construed and defined by the court, it will be presumed that the Legislature was familiar with such interpretation at the time of such amendment, and that such interpretation was intended to

---

*McLaren, M.D.'s, Neurology, P.C.* (Mo.App.1999), 998 S.W.2d 821, 824, 826–827 (Mo.Rev.Stat. 416.141: Missouri's antitrust statutes "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes"); *Daraee v. Microsoft Corp.* (June 27, 2000), Or.Cir. No. 0004 03311, 2000 WL 33187306; *In re Wiring Device Antitrust Litigation* (D.C.N.Y.1980), 498 F.Supp. 79, 86–88 (South Carolina requires interpretation consistent with federal precedent); and *Blewett v. Abbott Laboratories* (1997), 86 Wash.App. 782, 938 P.2d 842, 846 (Wash.Rev.Code Ann. 19.86.920: "It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts").

{¶ b} See, also, *Berghausen v. Microsoft Corp.* (Ind.App.2002), 765 N.E.2d 592, 594; *Arnold v. Microsoft Corp.* (Nov. 21, 2001), Ky.App. No. 2000–CA–002144–MR, 2001 WL 1835377; and *Free v. Abbott Laboratories, Inc.* (C.A.5, 1999), 176 F.3d 298, 299 (applying Louisiana law), which all adopted and followed *Illinois Brick* where, like Ohio, their states' antitrust statutes did not contain provisions requiring parallel federal-state construction.

3. See, e.g., Alabama, Ala.Code 6–5–60(a); California, Cal.Bus.Prof.Code 16750(a); District of Columbia, D.C.Code Ann. 28–4509; Hawaii, Hawaii Rev.Stat. 480–3; Illinois, 740 Ill.Comp.Stat.Ann. 10/7(2); Kansas, Kan.Stat.Ann. 50–161(b); Maine, 10 Me.Rev.Stat.Ann. 1104(1); Maryland, Md. Com.Law Code Ann. 209(b)(2)(ii); Michigan, Mich.Comp.Laws Ann. 445.778(2); Minnesota, Minn. Stat.Ann. 325D.57; Mississippi, Miss.Code Ann. 75–21–9; Nebraska, Neb.Rev.Stat. 59–821; Nevada, Nev.Rev.Stat. 598A.210(2); New Mexico, N.M.Stat.Ann. 57–1–3(A); New York, N.Y.Gen.Bus. Law 340(6); North Dakota, N.D.Cent.Code 51–08.1–08(3); South Dakota, S.D.Codified Laws 37–1–33; Vermont, 9 Vt.Stat.Ann. 2465(b); Wisconsin, Wis.Stat.Ann. 133.18(1)(a).

4. See, e.g., R.C. 1331.021 (petroleum products competition provision adopted in 1981, 139 Ohio Laws, Part II, 2894); R.C. 1331.08 (augmenting available damages from double to treble in 2002 in an apparent attempt to conform with federal antitrust law, 149 Ohio Laws, Part IV, 6455); R.C. 1331.12 (statute of limitations amended in 1994 and 2002 to "more closely conform the statute of limitations for private actions under the Ohio antitrust law to those of the federal and most other state antitrust laws," 145 Ohio Laws, Part IV, 6591, and 149 Ohio Laws, Part IV, 6455); and R.C. 1331.16 (investigative demand-and-discovery provisions added in 1978, 137 Ohio Laws, Part II, 2624, and amended in 1981, 138 Ohio Laws, Part II, 3623, and 1996, 146 Ohio Laws, Part VI, 10785).

be adopted by such amendment as a part of the law, unless express provision is made for a different construction."

{¶ 13} Johnson contends that if the Valentine Act is to be interpreted in accordance with federal law, we should follow the federal law in effect at the time Ohio adopted the statute, not any federal case law determined after adoption. Ohio courts, however, have consistently interpreted the Valentine Act in accordance with federal judicial construction of the federal antitrust laws—without regard to when the federal court announced the case law. We decline to abandon that precedent here. See, e.g., *C.K. & J.K.*, 63 Ohio St.2d at 204, 17 O.O.3d 124, 407 N.E.2d 507, where we relied on federal case law from as late as 1962 to interpret an 1898 provision of the Ohio Valentine Act; and *List v. Burley Tobacco Growers' Co-op. Assn.* (1926), 114 Ohio St. 361, 151 N.E. 471, applying subsequent federal case law to an 1898 provision of the Ohio Valentine Act. See, also, *Acme Wrecking Co., Inc. v. O'Rourke Constr. Co.* (Mar. 1, 1995), 1st Dist. No. C–930856, 1995 WL 84188; *Lee v. United Church Homes, Inc.* (1996), 115 Ohio App.3d 705, 708–709, 686 N.E.2d 288 (Third Appellate District); *Pacific Great Lakes Corp. v. Bessemer & Lake Erie RR.* (1998), 130 Ohio App.3d 477, 491, 720 N.E.2d 551, fn. 7 (Eighth Appellate District); *Schweizer v. Riverside Methodist Hosps.* (1996), 108 Ohio App.3d 539, 542, 671 N.E.2d 312 (Tenth Appellate District).

{¶ 14} The Ohio General Assembly, and not this court, is the proper body to resolve public policy issues. In *State v. Smorgala* (1990), 50 Ohio St.3d 222, 223, 553 N.E.2d 672, we noted that "the General Assembly should be the final arbiter of public policy." See, also, *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network, Inc. v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21 (same). Indeed, the overwhelming majority of states that have addressed the issue of whether indirect purchasers may assert state antitrust claims have done so through legislative enactments, i.e., statutes explicitly rejecting *Illinois Brick*, rather than judicial declaration. Accordingly, as numerous other state legislatures have done, the Ohio General Assembly may enact a statute rejecting *Illinois Brick* if it so chooses.

{¶ 15} Accordingly, consistent with long-standing Ohio jurisprudence, which has followed federal law in antitrust matters, we adopt and follow *Illinois Brick*'s direct-purchaser requirement and hold that an indirect purchaser of goods may not assert a Valentine Act claim for alleged violations of Ohio antitrust law.

B. *The End–User Licensee Agreement*

{¶ 16} Johnson also asserts that her end-user licensing agreement ("EULA") with Microsoft makes her a direct purchaser for the purposes of *Illinois Brick*. This position, however, is not well taken.

{¶ 17} Other courts that have considered this argument have reached similar conclusions. In *Vacco v. Microsoft Corp.* (2002), 260 Conn. 59, 83–84, 793 A.2d 1048, the Connecticut Supreme Court noted, "This argument fundamentally misunderstands the import of the court's holding in *Illinois Brick*, [which focused] on the underlying economic transaction between the direct purchaser and the antitrust defendant and not, as the plaintiff contends, whether the plaintiff and the defendant were in contractual privity by virtue of a licensing agreement." Similarly, in *In re Microsoft. Corp. Antitrust Litigation* (D.Md. 2001), 127 F.Supp.2d 702, 709, the court found that "[a]lthough the EULA may establish a direct relationship between Microsoft and the consumer, that relationship is not sufficient to make the consumer a 'direct purchaser' within the meaning of *Illinois Brick*." Like Johnson, the plaintiffs in the federal litigation never alleged that they purchased either the software or the EULAs directly from Microsoft. Id. The court concluded, therefore, that "the immediate economic transaction constituting the purchase" occurs between the consumer and the retailer—not the consumer and Microsoft, and, as a result, the federal plaintiffs could not be considered direct purchasers under *Illinois Brick*. Id.

{¶ 18} In this case, Johnson has never alleged that she "was required to pay [Microsoft] for the acquisition of the licensing rights to use Windows 98." *Vacco*, 260 Conn. at 84, 793 A.2d 1048. Accordingly, because we agree with the analysis offered by other jurisdictions that have considered this issue, we hold that while acceptance of a EULA creates a legal relationship between the consumer and Microsoft, that relationship does not transform the consumer into a "direct purchaser" within the meaning of *Illinois Brick*.[5]

{¶ 19} Since Johnson has not established a direct-purchaser relationship with Microsoft, we need not address Johnson's remaining arguments regarding her ability to assert a Valentine Act claim.[6]

---

5. See, also, *Minuteman, LLC v. Microsoft Corp.* (2002), 147 N.H. 634, 640–641, 795 A.2d 833, in which the New Hampshire Supreme Court held that plaintiffs' decision to accept a Microsoft EULA does not change the fact that they never purchased a product directly from Microsoft and therefore "cannot be considered a direct purchaser for purposes of *Illinois Brick*"; *Siena v. Microsoft Corp.* (R.I.2002), 796 A.2d 461, 465, where the Rhode Island Supreme Court concluded that a EULA and a consumer warranty do not "vest plaintiffs with standing to sue as direct purchasers. The licensing agreement is simply an agreement between the parties that the user will not infringe on Microsoft's copyright; it does not place the parties in direct purchaser privity with each other"; *Davidson v. Microsoft Corp.* (2002), 143 Md.App. 43, 792 A.2d 336 (adopting rationale of *In re Microsoft Corp. Antitrust Litigation*, 127 F.Supp.2d at 709, and holding that consumers/end users as licensees are not direct purchasers); *Sherwood v. Microsoft Corp.* (July 31, 2003), Tenn.App. No. M2000–01850–COA–R9–CV, 2003 WL 21780975, holding that the EULA, "a method used to protect copyrights, does not transform indirect purchasers into direct purchasers"; *Pomerantz v. Microsoft Corp.* (Colo.App.2002), 50 P.3d 929, 934–935, where the court concluded that the EULA has "no bearing on whether the consumer is a direct purchaser under *Illinois Brick*."

6. Johnson also avers that the Valentine Act is not limited to intrastate conduct and that it does not require proof of a combination, contract, or conspiracy to assert a claim for unlawful monopolization.

*Restitution & Unjust Enrichment*

{¶ 20} Johnson also asserts a common-law restitution claim on the theory that Microsoft benefited from unjust enrichment due to its monopolistic pricing practices. Unjust enrichment occurs when a person "has and retains money or benefits which in justice and equity belong to another," *Hummel v. Hummel* (1938), 133 Ohio St. 520, 528, 11 O.O. 221, 14 N.E.2d 923, while restitution is the "common-law remedy designed to prevent one from retaining property to which he is not justly entitled," *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 256, 2 O.O.2d 85, 141 N.E.2d 465. To establish a claim for restitution, therefore, a party must demonstrate "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 12 OBR 246, 465 N.E.2d 1298.

{¶ 21} As this court has stated, the purpose of such claims "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." *Hughes v. Oberholtzer* (1954), 162 Ohio St. 330, 335, 55 O.O. 199, 123 N.E.2d 393. In addition, we are mindful of the court's concerns expressed in the case of *In re Terazosin Hydrochloride Antitrust Litigation* (S.D.Fla.2001), 160 F.Supp.2d 1365, where the court noted that "[s]tate legislatures and courts that adopted the *Illinois Brick* rule against indirect purchaser antitrust suits did not intend to allow 'an end run around the policies allowing only direct purchasers to recover.'" Id. at 1380, quoting *Segura*, 907 S.W.2d at 506.

{¶ 22} The rule of law is that an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser. The facts in this case demonstrate that no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit "to which it is not justly entitled." *Keco Industries*, 166 Ohio St. at 256, 2 O.O.2d 85, 141 N.E.2d 465. Therefore, we affirm the court of appeals' determination that the trial court properly dismissed Johnson's common-law claims.

*The Ohio Consumer Sales Practices Act*

{¶ 23} Johnson predicated an Ohio Consumer Sales Practices Act claim on Microsoft's monopolistic pricing practices, arguing that the CSPA applies in cases where consumers are injured due to anticompetitive conduct. Microsoft contends that Johnson failed to establish the elements necessary to maintain this claim as a class action, that the CSPA does not apply to anticompetitive conduct, and that

she failed to demonstrate Microsoft's connection to a consumer transaction in Ohio.

{¶ 24} The Consumer Sales Practices Act, R.C. Chapter 1345, prohibits suppliers from committing either unfair or deceptive consumer sales practices or unconscionable acts or practices as catalogued in R.C. 1345.02 and 1345.03. In general, the CSPA defines "unfair or deceptive consumer sales practices" as those that mislead consumers about the nature of the product they are receiving, while "unconscionable acts or practices" relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue.[7] Neither of

---

7. {¶ a} Compare R.C. 1345.02 with R.C. 1345.03:

{¶ b} R.C. 1345.02(B):

{¶ c} "Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

{¶ d} "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

{¶ e} "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;

{¶ f} "(3) That the subject of a consumer transaction is new, or unused, if it is not;

{¶ g} "(4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;

{¶ h} "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;

{¶ i} "(6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;

{¶ j} "(7) That replacement or repair is needed, if it is not;

{¶ k} "(8) That a specific price advantage exists, if it does not;

{¶ l} "(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

{¶ m} "(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false."

{¶ n} R.C. 1345.03(B):

{¶ o} "In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:

{¶ p} "(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect his interests because of his physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

{¶ q} "(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;

{¶ r} "(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

{¶ s} "(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

{¶ t} "(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

these practices, however, encompasses the type of conduct that Johnson alleged against Microsoft—manipulating market forces to thwart competition.

{¶ 25} We agree with the analysis offered by the appellate court that the legislature created separate statutory schemes for antitrust issues and for consumer sales practices. See, also, *Kieffer v. Mylan Laboratories, Inc.* (Sept. 9, 1999), N.J.Super. No. BER–L–365–99–EM, 1999–2 Trade Cas. (CCH) ¶ 72,673, where the court noted that "[i]t is most significant that there is no case law construing the [Consumer Fraud Act] in a way that would include defendants' anticompetitive and monopolistic actions in the lexicon of unconscionable commercial practices. * * * [T]here is nothing inherently misleading or fraudulent in the defendants' acts of controlling the supply and overcharging for [certain drugs]. The defendants' attempt to control the supply and to charge excessive prices for the prescription drugs * * * is typical anticompetitive conduct, for which a remedy is provided in the antitrust statutes." [8]

{¶ 26} Thus, a complaint that alleges a violation of the Ohio Consumer Sales Practices Act predicated upon monopolistic pricing practices does not state a claim upon which relief can be granted because the Valentine Act, not the CSPA, provides the exclusive remedy for engaging in such conduct.

## Conclusion

{¶ 27} With respect to the major issues presented in this appeal, we conclude that consistent with long-standing Ohio jurisprudence in following federal law regarding antitrust cases, an indirect purchaser of goods may not file a Valentine Act claim for violations of Ohio antitrust law. Moreover, to establish a claim for restitution, a plaintiff must demonstrate that he or she conferred a benefit on a defendant without compensation, and since Johnson has not engaged in any transaction with Microsoft, she cannot establish such a claim. Finally, the Valentine Act, not the CSPA, provides the exclusive remedy for engaging in

---

{¶ u} "(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment;

{¶ v} "(7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy."

8. Several other jurisdictions have concluded that indirect purchasers cannot assert state consumer-protection claims based on alleged violations of antitrust law. See, e.g., *Vacco*, 260 Conn. 59, 793 A.2d 1048; *Sherwood v. Microsoft Corp.* (2003), Tenn.App. No. M2000–01850–COA–R9–CV; *Gaebler v. New Mexico Potash Corp.* (1996), 285 Ill.App.3d 542, 544, 221 Ill.Dec. 707, 676 N.E.2d 228; *Blewett v. Abbott Laboratories* (1997), 86 Wash.App. 782, 938 P.2d 842, 847; *Kieffer v. Mylan Laboratories, Inc.* (Sept. 9, 1999), N.J.Super. No. BER–L–365–99–EM; *Segura*, 907 S.W.2d at 505–506.

monopolistic pricing practices in Ohio, and a party who fails to establish a consumer transaction with a supplier lacks standing to assert a CSPA claim.

{¶ 28} Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

RESNICK, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

MOYER, C.J., and BRYANT, J., dissent.

PEGGY BRYANT, J., of the Tenth Appellate District, sitting for PFEIFER, J.

---

**BRYANT, J., dissenting.**

{¶ 29} Being unable to agree with the majority opinion, I respectfully dissent. The majority holds in the syllabus that "[c]onsistent with long-standing Ohio jurisprudence in following federal law regarding antitrust cases, an indirect purchaser of goods may not file a Valentine Act claim for violations of Ohio antitrust law. (*Illinois Brick v. Illinois* (1977), 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, followed.)" To the contrary, Ohio's Valentine Act permits indirect purchasers to file claims for violations of Ohio antitrust law.

{¶ 30} The Ohio Valentine Act includes R.C. 1331.08, which provides that "the person injured * * * by reason of anything forbidden or declared to be unlawful in [R.C. 1331.01 to 1331.14] may sue * * * and recover treble the damages * * *." The statute on its face does not require that a person be directly injured in order to recover. Rather, it is broadly worded to include any person injured by reason of a violation of the Valentine Act.

{¶ 31} Relying on *List v. Burley Tobacco Growers' Co-op. Assn.* (1926), 114 Ohio St. 361, 151 N.E. 471, and *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.* (1980), 63 Ohio St.2d 201, 17 O.O.3d 124, 407 N.E.2d 507, the majority observes that, historically, Ohio courts have considered federal case law in construing the Act's provisions. Based on that precedent, the majority concludes that in construing R.C. 1331.08, it should consider *Illinois Brick*, a decision issued a year after the statute was last enacted or amended. Noting that "some 18 states and the District of Columbia have enacted statutes explicitly rejecting *Illinois Brick* and permitting indirect purchasers to bring state-law antitrust actions," the majority further concludes that indirect purchasers may seek redress for antitrust injury only if the General Assembly legislatively "repeals" the *Illinois Brick* doctrine.

{¶ 32} *List* does not dictate the majority's conclusion, but instead supports allowing indirect purchasers to bring actions under the Valentine Act. *List* looked at the trend of antitrust case law, including not only federal court decisions, but also decisions from courts in other states. *List*, 114 Ohio St. at

392–394, 151 N.E. 471. The reality is that the majority of states now permit indirect-purchaser actions. See *Comes v. Microsoft Corp.* (Iowa 2002), 646 N.W.2d 440, 448 ("In total, thirty-six states and the District of Columbia recognize a cause of action for indirect purchasers"). Even if we look to the status of the law when most sections of the Valentine Act were last amended (1976), the trend of the federal decisions at the time favored permitting indirect purchasers to sue those who violate antitrust provisions. Id. at 447.

{¶ 33} Similarly, the majority's reliance on *C.K. & J.K., Inc.*, 63 Ohio St.2d 201, 17 O.O.3d 124, 407 N.E.2d 507, is not persuasive. Citing *C.K. & J.K.* for the proposition that "Ohio has long followed federal law in interpreting the Valentine Act," the majority states that in accordance with this practice, "we shall review the status of federal law with respect to who may properly assert an antitrust action." Indeed, Ohio and other states have looked to the federal courts for guidance in substantive law, such as setting uniform standards of conduct prohibited under the antitrust acts. *Comes v. Microsoft Corp.*, 646 N.W.2d at 446 ("The purpose behind both state and federal antitrust law is to apply a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct").

{¶ 34} Ohio and other states, however, have not relied on federal law in matters of practice and procedure, including the issue of standing. In fact, the United States Supreme Court has declared that uniformity in state and federal law on the issue of who may sue for recovery is unnecessary, as "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *California v. ARC Am. Corp.* (1989), 490 U.S. 93, 103, 109 S.Ct. 1661, 104 L.Ed.2d 86. Rather, "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." Id. at 102, 109 S.Ct. 1661, 104 L.Ed.2d 86. See, also, *Bunker's Glass Co. v. Pilkington, PLC* (2003), 206 Ariz. 9, 16, 75 P.3d 99 (noting that Arizona courts have not followed federal law on "the threshold issue of who may bring a state-law-based claim in a state court"); *Comes*, supra, 646 N.W.2d at 446 (observing that states may set their own rules for who may sue in state courts without impairing the desired national uniformity and predictability in substantive standards of conduct). Indeed, to conclude that *C.K. & J.K., Inc.* or *List* precludes indirect purchasers from suing under the Valentine Act would defeat one of the purposes of that Act: to provide a remedy to those injured by reason of violations of the Act.

{¶ 35} The majority nonetheless relies on the legislature's failure, since *Illinois Brick*, to amend the Act to specifically allow indirect purchasers to sue under R.C. 1331.01 et seq. From that inaction, the majority concludes that the legislature embraces the *Illinois Brick* doctrine. The legislature, however, would

have no reason to include indirect-purchaser language in R.C. 1331.08, as this court has never stated that it would rigidly adhere to each decision that the federal courts issued under the federal antitrust laws. To foist onto the General Assembly the obligation to override *Illinois Brick*, or any other decision of the federal courts that it does not support, places on the legislature the unenviable burden of monitoring, and responding to, each federal judicial gloss on the federal antitrust laws, even though this court has never adopted that gloss on Ohio's antitrust laws. See *Hyde v. Abbott Labs., Inc.* (1996), 123 N.C.App. 572, 582, 473 S.E.2d 680 (noting in an antitrust case that "the intent of the General Assembly may only be discerned by its actions, and not its failure to act").

{¶ 36} Rather than apply any and all federal limitations to the Valentine Act, this court should defer to the legislature to create exceptions to the broad language of R.C. 1331.08 that permits any person injured to bring an action under R.C. 1331.08. See *Bunker's Glass Co.*, 206 Ariz. at 17, 75 P.3d 99. Unless the legislature amends R.C. 1331.08 to preclude indirect-purchaser actions, this court should address the statute and apply its unambiguous language that allows all purchasers to redress antitrust injury under Ohio's antitrust laws.

{¶ 37} Ohio would not be alone in doing so. Not only do the majority of states now allow consumers, as indirect purchasers, to seek redress under their antitrust laws, see *Comes,* 646 N.W.2d at 448, but at least five of those states allow indirect purchasers to pursue antitrust claims even though, like Ohio, (1) their states have not enacted "repealer" statutes, (2) the states have antitrust statutes with language very similar to Ohio's, and (3) the states, either judicially or by statute, are guided by federal antitrust decisions in construing their state antitrust laws. See *Arthur v. Microsoft Corp.* (2004), 267 Neb. 586, 676 N.W.2d 29; *Comes v. Microsoft Corp.,* supra; *Bunker's Glass Co. v. Pilkington,* 206 Ariz. 9, 75 P.3d 99; *Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 473 S.E.2d 680; *Sherwood v. Microsoft Corp.* (July 31, 2003), Tenn.App. No. M2000–01850–COA–R9–CV, 2003 WL 21780975.

{¶ 38} Microsoft already has been adjudicated to be in violation of antitrust laws. *United States v. Microsoft Corp.* (D.D.C.2000), 87 F.Supp.2d 30, reversed in part on other grounds (C.A.D.C.2001), 253 F.3d 34. See, also, *New York v. Microsoft Corp.* (D.D.C.2002), 209 F.Supp.2d 132, in which the state of Ohio was not a party but filed an amicus brief. Id. at 136, fn. 2.

{¶ 39} The indirect purchaser is often the only "person" with an actual injury and resulting inducement to rectify the antitrust violations of a monopolistic corporation. Because federal law is clear that indirect purchasers may not bring antitrust claims in federal court, redress of such claims is left to state courts. Yet the majority's holding would deny any remedy to Ohio's citizens for their injury, contrary to Section 16, Article I, Ohio Constitution (stating that "[a]ll

courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay").

{¶ 40} Other laws in Ohio make clear that the legislature intends that consumers, the ultimate purchasers who are often the only persons who suffer any real injury, be provided a remedy for injury, including higher prices, sustained due to a corporation's unlawful or anticompetitive conduct. See Ohio's Consumer Sales Protection Act, R.C. 1345.01 et seq., and Ohio's Pattern of Corrupt Activity Act, R.C. 2923.32 et seq., especially R.C. 2923.34(F). Similar circumstances support application of the unambiguous language of R.C. 1331.08.

{¶ 41} In the final analysis, to deny indirect purchasers redress in Ohio courts in this case benefits only the party who already has been determined to have unlawfully restrained trade in Ohio. At the same time, it would deny recovery to persons actually injured as a result of that conduct, who are the persons who have a reason to bring antitrust claims: the consumers who purchase the goods and pay the overcharges that the direct purchasers can pass on to them. The purpose of the Valentine Act is to protect Ohio's public from anticompetitive conduct. The majority's holding defeats that purpose, and so I dissent.

MOYER, C.J., concurs in the foregoing dissenting opinion.

———

Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley, Paul M. De Marco, and Robert Heuck II; Barrett & Weber, L.P.A., and Michael R. Barrett; Markovits & Greiwe Co., L.P.A., and W.B. Markovits, for appellant.

Dinsmore & Shohl, L.L.P., Gregory Harrison, and John Luken; Sullivan & Cromwell, L.L.P., David P. Tulchin, and Richard C. Pepperman II, for appellee.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Edward A. Matto, and Anne Marie Sferra; Taft, Stettinius & Hollister, L.L.P., R. Joseph Parker, William J. Seitz, and Jeanne M. Bruns, urging affirmance for amici curiae Ohio Manufacturers' Association, Ohio Chapter of National Federation of Independent Business, Ohio Chemistry Technology Council, and Ohio Chamber of Commerce.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, and Jennifer L. Pratt, Assistant Attorney General, urging reversal for amicus curiae Attorney General of Ohio.

Weinstein, Kitchenoff, Scarlato, Karon & Goldman Ltd. and Daniel R. Karon, urging reversal for amici curiae National Consumers League, Consumer Action, and Organization for Competitive Markets.

Norman Hawker and Albert A. Foer; Benesch, Friedlander, Coplan & Aronoff, L.L.P., and Mark D. Tucker, urging reversal for amicus curiae American Antitrust Institute.